NORTHWESTERN TELEPHONE SERVICE COMPANY, APPLICATION,
IN RE.

Public Utilities Commission

No. 26764.   Decided August 30, 1958.

Mr. W. E. Hamaker and Mr. Joseph Quatman, for the applicant.

*Mr. Robert L. Moulton*, for The Northwestern Ohio Telephone Subscribers' Association, Protestant;

*Mr. Floyd A. Coller*, for the Village of Rising Sun, Protestant.

*Mr. William Saxbe*, attorney general, by *Mr. James F. DeLeone*, assistant attorney general, for The Public Utilities Commission of Ohio.

## Finding and Order

The Commission coming now to consider the above-entitled Application and the Exhibits attached thereto; the matters contained in the Report of the Secretary, issued pursuant to the provisions of Section 4909.18, Revised Code; the testimony and exhibits adduced at the public hearing; and, being otherwise fully advised in the premises and in compliance with Section 4903.09, Revised Code, hereby renders its Opinion and Findings.

*Nature of Proceeding*:

The Applicant, The Northwestern Telephone Service Company, seeks to increase local exchange rates and charges and certain intracompany toll rates and charges to subscribers throughout its operating area.

*History of Proceeding*:

January 10, 1957   Application filed by The Northwestern Telephone Service Company, and in conformity with Section 4909.18, Revised Code, proferred certain exhibits numbered 1 through 6, being:

(1) Present General and Local Exchange Tariff, PUCO No. 10;

(2) Proposed General and Local Exchange Tariff, PUCO No. 11;

(3) A summary of primary accounts of the estimated cost of reproduction new, the amount of existing depreciation (expressed in percentage and dollar amount) and the present value of all property of the Applicant as of October 31, 1956, used

and useful in the rendition of telephone service to its subscribers, including a computation of working capital and material and supplies;

(4) Rate study showing monthly revenues under existing and anticipated rates and charges;

(5) A pro forma income statement showing income and expenses for the twelve-month period ending October 31, 1956, adjusted to reflect changes in the revenues and expenses during this period, and adjusted to reflect increased revenues, expenses and taxes accruing by the application of the proposed increased rates;

(6) A detailed inventory and appraisal showing as of October 31, 1956, the reproduction cost new less existing depreciation of Applicant's plant and property used and useful in the rendition of telephone service to its subscribers.

January 10, 1957   Motion filed requesting the approval of the use of October 31, 1956, as the date certain for the determination of valuation of Applicant's properties, the twelve-month period ending on such date as the accounting period for purposes of the Application, and to approve the attached form of legal notice.

January 31, 1957   Order issued approving Applicant's form of legal notice, and authorizing use of October 31, 1956, as the date certain for valuation of Applicant's property, and approving the twelve-month period ending October 31, 1956, as the test period for accounting purposes.

November 4, 1957   Supplemental Application filed together with inventory and appraisal of the estimated reproduction cost new, less existing depreciation, of certain property used in the rendering of Applicant's service to the public, which property was not included in Exhibits 3 and 6 filed with the original Application.

April 17, 1958   Report of the Secretary of the Commission filed.

May 16, 1958   Objection to the Report of the Secretary of the Commission filed by Protestant, The Northwestern Ohio Telephone Subscribers' Association.

June 24, 1958   Public hearing held on the Application; continued hearings held July 15, 1958, July 22, 1958, and July 23, 1958.

*Discussion and Findings*:

Applicant's Counsel in his opening statement reiterated the fact that Applicant filed no objections or exceptions to the Report of The Secretary of the Commission and further stated that, in view of the reasonableness of the rate of return as shown by such Report, Applicant intended to stand on the Secretary's Report. (R. 8, 9.) Protestants' pertinent objections to the Report of the Secretary may be summarized as follows: *first,* the Staff's recommended RCNLD rate base of $5,025,897.00 is erroneous in that such rate base valuation fails to exclude values properly allocable to Applicant's Michigan properties; *second,* that since such recommended rate base is the basis of calculations of rate of return as shown in Schedule No. 1 of the Accounting Report, such computed rates of return as set forth therein are also in error; *third,* that the percentage of existing depreciation as determined by the Commission's Engineering Staff, viz., 15.94%, is erroneous in that the same does not adequately represent existing depreciation because (a) previous service investigation of this Commission revealed certain of Applicant's equipment to be "over age, overloading, and unreliable" and certain of Applicant's exchanges are still served by wall-type magneto instruments, and (b) Applicant's balance sheet as of December 31, 1956, shows that its depreciation reserve is in the ratio of 25% of Applicant's depreciable plant and property; and, *finally,* exceptions are taken to certain items of reserve and expense listed in Schedule No. 1 of the Accounting Report by reason of variance thereof with similar items in the Company's filed Annual Report for 1956, as well as to all items of adjustment in Column 2 of Schedule No. 1 of the Accounting Report.

### 1. *Rate Base*

Applicant's Exhibit 6 sets forth in summary form its claimed statutory rate base valuation as follows:

*For All Properties*

| | |
|---|---:|
| Reproduction Cost New at October 31, 1956 | $6,485,369 |
| *Less*—Depreciation (10.52%) | 682,455 |
| Reproduction Cost New Less Depreciation | $5,802,914 |

*For Michigan Properties*
| | |
|---|---:|
| Reproduction Cost New at October 31, 1956 | $    24,506 |
| *Less*—Depreciation (15.95%) | 3,908 |
| Reproduction Cost New Less Depreciation | $    20,598 |

*For Ohio Properties*
| | |
|---|---:|
| Reproduction Cost New at October 31, 1956 | $6,460,863 |
| *Less*—Depreciation (10.50%) | 678,547 |
| Reproduction Cost New Less Depreciation | $5,782,316 |

Included in the proposed rate base was an allowance for material and supplies, and working capital in the sum of $204,681.10 from which was deducted $81,089.83, representing a 50% offset of federal income tax accruals for the twelve months ending October 31, 1956, producing a net of $123,591.27 as a claimed allowance for working capital, and materials and supplies.

Following the Engineering Staff's investigation, a reproduction cost new less existing depreciation valuation of $5,025,897.00 was recommended in that Staff's Report as contained in the Secretary's Report. This statutory rate base was computed in the following manner:

*For All Properties*
| | |
|---|---:|
| Reproduction Cost New at October 31, 1956 | $5,882,332 |
| *Less*—Depreciation (15.99%) | 940,845 |
| Reproduction Cost Less Depreciation | $4,941,487 |

*For Michigan Properties*
| | |
|---|---:|
| Reproduction Cost New at October 31, 1956 | $    28,499 |
| *Less*—Depreciation (26.12%) | 7,443 |
| Reproduction Cost New Less Depreciation | $    21,056 |

*For Ohio Properties*

| | |
|---|---|
| Reproduction Cost New at October 31, 1956 | $5,853,833 |
| *Less*—Depreciation (15.94%) | 933,402 |
| Reproduction Cost New Less Depreciation | $4,920,431 |

To this recommended RCNLD property valuation, the Engineering Staff added the sums of $48,000.00 as working capital and $117,500.00 as an allowance for maintenance material and supplies. Offsetting against this total of $165,500.00 the sum of $81,090.00 representing a deduction of 50% of the Company's federal income tax accruals, a total allowance of $84,410.00 for working capital and material and supplies was recommended in the Commission's Engineering Report.

The difference between the Company's proposed estimated statutory rate base valuation and that recommended by the Commission's Engineering Staff arose by reasons that Applicant's estimated reproduction cost new valuation was $603,-037.00 in excess of that recommended by the Commission's Staff, and its estimated existing depreciation was $258,390.00 less than that adjudged by the Staff. The valuation differentials found by the Engineering Staff may be summarized as follows: $109,-039.00 due to inventory changes; $178,278.00 attributable to unit cost pricing changes, these adjustments being almost entirely due to the Staff's application of lower prices for Central Office equipment; and $315,720.00 by reason of general overhead pricing changes.

In determining the Applicant's statutory rate base for purposes of this proceeding, the depreciated RCN value of Applicant's plant and property devoted to the rendition of telephone service to its Michigan subscribers must first be ascertained. The valuation of Applicant's total plant and property recommended by the Commission's Engineering Staff as of the date certain herein was $5,882,332.00. Deducting therefrom the Staff's estimated existing depreciation in the sum of $940,-845.00, a reproduction cost new less depreciation value of $4,941,487 for all of Applicant's plant and property is produced. In PUCO Exhibit No. 1, containing amended exhibits to the Report of the Secretary, Applicant had in service as of

the date certain 16,645 stations on a Company-wide basis, 16,543 of these were in Ohio and the remaining 102 served Michigan subscribers. Thus, the per station investment in plant and property devoted to Company-wide service is $296,875. This amount, multiplied by number of Applicant's stations located in Ohio, gives rise to a sum of $4,911,203.13 representing the value of Applicant's plant and property used and useful in the rendition of its public utility service within the territorial confines of the State of Ohio.

As noted above, the Engineering Staff in recommending a statutory rate base added an allowance of $84,410.00 for working capital, material and supplies. Analysis of the Accounting Exhibits contained in the Report of the Secretary indicates that Applicant's continuing aggregate federal and other tax accruals will more than offset the amount allowed by the Commission's Engineers. The Commission, perforce, makes no allowance in the rate base for such items. *City of Cincinnati* v. *PUCO*, 161 Ohio St., 395.

The Commission is of the opinion, and so finds herein, that the ascertained statutory rate base for the purpose of this proceeding is $4,911,203.13.

### 2. *Rate of Return*

The next determination to be considered by the Commission herein is what percentage will represent a fair annual "rate of return" to this Applicant on the above-ascertained statutory valuation of its Ohio properties used and useful in the rendition of telephone public utility service, and will thereby represent a yearly reasonable compensation for the service rendered. Section 4909.15, Revised Code, *City of Marietta* v. *Public Utilities Commission of Ohio,* 148 Ohio St., 173, *City of Cleveland* v. *Public Utilities Commission of Ohio,* 164 Ohio St., 442.

After considering the evidence adduced upon the record of this proceeding, it is the opinion of the Commission, and it so finds herein, that a 5.85% percentage, after the payment of all operating expenses, including taxes and depreciation charges, will represent a fair annual rate of return on the Applicant's statutory rate base valuation of its property used and useful in rendering telephone utility service and will thereby yield

a yearly reasonable compensation for the service proposed to be rendered. This rate of return will provide sufficient revenues to service the proportionate capital component equivalents of this Applicant's statutory rate base valuation.

In testing the reasonableness of this rate of return, it is significant to note that when queried on cross-examination with respect to the 4.93% rate of return requested in its Application, Applicant's President, while stating that the same had been arrived at by an "end result" method, did admit that in making such computation, due regard, among other things, had been given to the value of the property used and useful in the rendition of the utility service. (Record, p. 356.)

### 3. *Dollar Annual Return*

To determine the "dollar annual return" to which this Applicant utility is entitled, application of the foregoing 5.85% rate of return against the afore-ascertained statutory rate base of $4,911,203.13 yields an annual dollar amount of return of $287,305.38 *after* payment of *all* operating expenses, including taxes and depreciation charges. This "dollar annual return" of $287,305.38:

(A) Would provide the Applicant utility with funds sufficient to meet the respective earning requirements of the hypothetical capital components substantially equivalent to the above-ascertained statutory rate base (which amounts exceed Applicant's actual earning requirements based on the existing capitalization), with an adequate balance for contingencies and surplus.

(B) Would enable the Applicant Utility to pay 6-1⁄4% dividends on the proportionate hypothetical equity equivalent of the statutory rate base assuming an approximate 70% pay out ratio, with equity net earnings of approximate 8.9% on the proportionate equity equivalent of such rate base after provision for all fixed charges.

The Commission is of the opinion, therefore, and so finds herein, that this Applicant utility is entitled to a dollar annual return of $287,305.38.

### 4. *Cost of Service*

#### A. *Expenses Other Than Federal Income Taxes and Depreciation*

In order to determine whether the rates and charges presently being collected by the Applicant are sufficient to yield an annual reasonable compensation for the service rendered, it is necessary to effect certain adjustments in revenues and expenses for the accounting period in order to reflect station growth and known increases in cost levels. When a rate base is established and ascertained as of a specific date certain, it purports to reflect the valuation of all of the utility's property used and useful as of that date certain; perforce, where additional stations and properties are being added continually throughout the preceding twelve-month test period or year, the annual revenues and expenses should be and are adjusted to reflect the level of stations in service at the end of that test period or year as though such stations had been in service throughout the entire year. Such adjustments under existing rates may be made by annualization of certain items of revenue and expense; ascertainment of the additional compensation, if any, required may be effected by projections of such revenue and expense items.

Revenue and expense adjustments, including allocation of such items applicable to Ohio and Michigan subscribers, were made by the Commission's Staff and set forth in the Report of Amended Exhibits by the Secretary. Such report was accepted by the Applicant.. However, Protestant Northwestern Telephone Subscribers' Association (Protestants) challenged certain adjustments made to the Uncollectible Revenues Account, and to the Staff's allowance of additional expenses to reflect station gain during the test period. Testimony in relation to these items was presented through Protestant's Witness Yeager, who also identified and explained Protestant's Exhibit No. 1, a pro forma income statement, with adjustments and explanations attached.

*Uncollectible Revenues*

The Commission's Accounting Staff, in the Report of Amended Exhibits by the Secretary (Accounting Schedule No. 1) recommended an adjusted figure of $6,656.67. This was computed by taking the average of the actual percent accruals for uncollectible revenues for 1955, 1956 and 1957, or .544%, and applying this to the Company's annualized revenues applic-

able to Ohio. Protestants proposed a different method. (R. 471-472.) Under this method, since the date certain is October 31, 1956, 10/12 of the actual accrual for uncollectible revenues for 1956 is added to 2/12 of the actual accrual, for uncollectible revenues for 1955, giving a total of $5,314.68.

The Commission finds that this latter method of determining the amount to be allowed for uncollectible revenues to be a proper one in this case. This amount, viz. $5,314.68, related to the Company's actual revenues for the test year, produces a percentage accrual figure of .451% which, multiplied by the annualized revenues, results in annualized uncollectible revenues of $5,505.81, which the Commission finds and determines to be the amount of uncollectible revenues deductible from revenues for the purpose of this proceeding.

*Allowance of Additional Expenses to Reflect Station Gain*

As herein above noted, the Protestants objected to the amount of the adjustment in the expense items designed to reflect annualized expenses attributable to increases in cost and increases in stations during the test year.

The method utilized by the Applicant and recommended by the Commission's Accounting Staff may be termed as the "operating ratio method." Under this method, the ratio of operating expenses, other than depreciation and taxes, to gross revenues is applied to the increase in revenues due to annualization. The Secretary's Report discloses that the application of this method by the Staff resulted in an expense adjustment of $20,481.17.

Protestant's Witness Yeager utilized a different method. In substance, the Protestants proposed to treat part of the Company's expenses as relatively fixed and part of the Company's expenses as varying directly with the number of stations. The relatively fixed portion of expenses, under the Protestant's method, is payroll cost. The remainder of the expenses are considered variable. The Protestants, under this theory, proceed by attempting to determine the relation between station gains and increases in employees by averaging these over a three-year period ending on the date certain. Protestant's Witness Yeager testified that, on the average, one new employee was added for each 251 stations. He concluded that since 871 sta-

tions were added during the test year, 3.47 additional employees were presumably required. This was multiplied by the average wage for this Company in 1956 which was calculated to be $2,253.90 giving $7,821.03 purporting to represent the additional payroll cost associated with 871 stations.

The Protestants calculated the variable cost by dividing total operating expenses less payroll for 1956, by the number of stations in service as of December 31, 1956, and multiplying this by the 871 stations added during the test year. Protestants arrive at the amount of $8,675.16 purporting to represent the variable cost associated with 871 stations. The sum of the calculated payroll and variable cost associated with the added stations was thus calculated to be $16,496.19. Protestant's Witness Yeager then proceeded to determine the part of the cost which had not been included in the operating expenses by calculating the proportion that the increase in local service revenues through annualization bore to the sum of this increase plus the excess of local service revenues in 1956 over local service revenues in 1955. This proportion, amounting to 40.08%, applied to the $16,496.19, produced the sum of $6,611.67, which was claimed to be the proper expense adjustment in this case.

The Commission has carefully considered both of the above methods of computing the estimated expense adjustment and is of the opinion neither method produces exact estimates. Insofar as the ''operating ratio method'' is concerned, it is based upon the assumption that a fixed relation exists between operating revenues and operating expenses. Protestant's method, on the other hand, although it avoids this assumption, is open to question at so many points as to make it incumbent upon the Commission to reject it in this proceeding. As examples of difficulties involved in this method, the following may be mentioned:

(1) Use of a three-year average of number of employees to number of stations. Mr. Yeager found this average to be 1 added employee per 251 added stations. However, that the representativeness of this average is questionable is indicated by the following (Northwestern Ohio Telephone Subscribers' Association Exhibit No. 1, p. 7 and R. 495):

| Years | Added Employees | Added Stations | Added Stations per Added Employees |
|-------|-----------------|----------------|------------------------------------|
| 1954  | 3               | 1,617          | 539                                |
| 1955  | 1               | 776            | 776                                |
| 1956  | 9               | 871            | 96.8                               |
| 1957  | 13              | 801            | 61.5                               |
|       | 26              | 4,065          | 156                                |

(2) Use of number of employees rather than man-hours.

(3) Failure to segregate that part of the payroll devoted to something other than operations, such as construction. Mr. Yeager, when questioned on this point (R. pp. 491-492) stated that he thought this would only result in further reducing the expense adjustment figure he had calculated. It is true that it would reduce the average payroll per employee which he multiplies by his 3.47 employees to obtain his added payroll cost. However, it would raise his variable cost considerably more, in that it would increase his figure for operating expenses less payroll per station which he multiplies by the 871 added stations.

(4) Understatement of average payroll per employee. Protestant's estimate was apparently calculated by dividing the actual payroll for 1956 by the number of employees at the end of 1956 rather than by the average number of employees or actual man-hours for 1956.

(5) Question as to the proper basis for determining the proportion of the increased payroll and variable cost applicable to 1956. Mr. Yeager proposed 40.08%, calculated on the basis of local service revenues only. Use of the Company's total revenues, however, raises this proportion to something in the order of 44% (R. pp. 517-524), and thereby increases the expense adjustment by approximately 4% of the total additional payroll and variable cost associated with the added stations.

In view of the above, the Commission cannot accept as a reasonably accurate estimate the expense adjustment figure proposed by Protestant. Moreover, the Commission is of the opinion, and so finds, that the expense adjustment figure recom-

mended by the Staff of $20,481.17, is the best estimate available of the additional expense corresponding to the increased revenues for purposes of this case.

The Commission finds, for the purpose of this proceeding, Applicant's annual operating expenses to be in the sum of $586,559.15.

B. *Depreciation Accruals and Federal Income Taxes*

From the evidence of record herein, the Commission is of the opinion, and so finds, that the proper annual allowance for depreciation for the purposes of this rate proceeding allocable to Applicant's Ohio properties should be an amount in the sum of $153,222.16. Per book depreciation charges were adjusted upward to reflect year-end levels of depreciation plant and property consistent with the annualization herein of other operating expenses and taxes.

Pursuant to the expense adjustments hereinabove discussed, the Commission finds that Applicant's Federal Income Tax Liability is in the sum of $231,447.55, and other tax liability in the sum of $98,637.12.

### 5. *Gross Annual Revenues*

Application of annualization methods to Applicant's revenue accounts produces an upward adjustment in revenue, both with respect to Local Service Revenues and to Message Toll and Miscellaneous Revenues. Per book Ohio revenues for the test period were $1,162,248.86, and adjusted, Total Revenues are increased by $51,894.33, totalling $1,214,143.19. This figure adjusted for uncollectibles as hereinbefore discussed produces an adjusted annual revenue figure in the sum of $1,215,294.05.

The Commission is of the opinion, and so finds, that this annual gross revenue, as produced under existing rates and charges, is insufficient to yield a yearly reasonable compensation to this Applicant as of the date certain, October 31, 1956.

The allowable gross annual revenue is herein found by the Commission to be $1,357,171.36, which is the arithmetic sum of the "Dollar Annual Return" and the "Cost of Service," plus Taxes and Depreciation Charges. To produce this increase in gross revenues will require an increase in Applicant's presently authorized rates of 11.66%.

*Disposition of Motion of Protestants With Regard to Service Investigation*

During the course of the public hearings Protestants sought to have this Commission consider the matter of the adequacy of the existing service of the Applicant Company. By virtue of the decision of the Ohio Supreme Court in *The Elyria Telephone Co.* v. *Public Utilities Commission of Ohio*, 158 Ohio St., 441, such matters were not considered in connection with the merits of this case. Protestants offered a motion requesting that this Commission institute a separate investigation into the adequacy of existing telephone service. The Commission finds this motion to be well made and that the same should be granted.

*Ultimate Findings*:

The Commission renders the following ultimate findings:

(1) That this Application is filed pursuant to, and this Commission has jurisdiction thereof under, the provisions of Sections 4909.17, 4909.18 and 4909.19, Revised Code;

(2) That the investigation required of the Commission by the provisions of Section 4909.19, Revised Code, has been filed and served as required by said statute;

(3) That the Applicant's statutory rate base for purposes of this proceeding is an amount in the sum of $4,911,203.13;

(4) That the existing rates now being charged and collected by the Applicant for the furnishing of telephone service to its subscribers in its service areas are insufficient to provide Applicant with an adequate return on the value of its plant and property used and useful in the furnishing of such telephone utility service;

(5) That the fair annual rate of return on the previously ascertained statutory rate base is 5.85%;

(6) That the dollar annual return to which this Applicant is entitled for purposes of this proceeding is $287,305.38;

(7) That the annual allowable expenses of this Applicant for purposes of this proceeding, with the inclusion of operating expenses, taxes, depreciation and other expenses, aggregate $1,069,865.98;

(8) That the allowable gross annual revenues to which Applicant is entitled for the purposes of this proceeding is $1,357,171.36; and

(9) That the motion of Protestants requesting that this

Commission institute and conduct an independent investigation into the adequacy of the existing services of the Applicant utility is well made and should be granted.

*Order*

It is, therefore,

Ordered, That in accordance with the findings and opinion herein set forth, the Applicant, The Northwestern Telephone Service Company, be, and the same hereby is, authorized to file with this Commission for its approval, adjusted tariff schedules increasing the rates and charges to subscribers in its service areas in the amount of $141,877.31, which will provide Applicant with a total gross annual revenue of approximately $1,357,171.36. It is further

Ordered, That such tariff schedules may become effective subsequent to their approval by this Commission or upon such subsequent date as the Commission may designate. It is further

Ordered, That the Department of Utilities of this Commission is hereby directed to institute an investigation into the adequacy of the service being rendered by the Applicant within its operating area, and to report the results of such investigation to this Commission.

The Public Utilities Commission of Ohio

Entered in the Journal
August 30, 1958
A true copy:
James L. Fullin, Jr.
James L. Fullin, Jr.
Assistant Secretary

Everett H. Krueger, Jr., Chairman
Ralph A. Winter
Edward J. Kenealy
Commissioners